**BLUMENTHAL NORDREHAUG BHOWMIK DE BLOUW LLP**
 Norman B. Blumenthal (State Bar #068687)
 Kyle R. Nordrehaug (State Bar #205975)
 Aparajit Bhowmik (State Bar #248066)
 Piya Mukherjee (State Bar #274217)
2255 Calle Clara
La Jolla, CA 92037
Telephone: (858)551-1223
Facsimile: (858) 551-1232

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATHAN CHRISTENSEN, an individual, on behalf of himself, and on behalf of all persons similarly situated,<br><br>                   Plaintiff,<br><br>vs.<br><br>CARTER'S RETAIL, INC.; and Does 1 through 50, Inclusive,<br><br>                   Defendants. | CASE No. 8:20-cv-00776 JLS (KESx)<br><br>**DECLARATION OF JEFFREY S. PETERSEN IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**<br><br>Date:        August 20, 2021<br>Time:        10:30 a.m.<br><br>Judge:        Hon. Josephine L. Staton<br>Dept.:        10A<br><br>Date Filed:  March 16, 2020<br>Trial Date:   N/A |

## Allman & Petersen Economics, LLC

| | |
|---|---|
| **7677 Oakport Street, Suite 610** | **Phillip H. Allman, Ph.D.** |
| **Oakland, CA 94621** | **Jeffrey S. Petersen, Ph.D.** |
| **(510) 382-1550** | |
| **(510) 382-1472 (FAX)** | **www.allmaneconomics.com** |

Nathan Christensen, et al. v. Carter's Retail Inc. at al.
Superior Court of California
County of Orange
Case No: 30-2020-01138792-CU-OE-CXC

March 10, 2021

Declaration of Plaintiffs' Survey Expert for Class Certification

## I.  Assignment and Summary of Conclusions

1.  I have been retained by Blumenthal Nordrehaug Bhowmik De Blouw LLP, in *Nathan Christensen, et al. v. Carter's Retail, Inc. et al.* (hereafter "this matter") to assess whether a survey can be utilized to provide valid and reliable data for determining liability and damages regarding unpaid wages.  Unpaid wages refers to off-the-clock work time or unpaid premium wages due to:

- off-the-clock security check time at the end of shifts,

- off-the-clock security check time during meal periods resulting in fewer than 30 minutes of duty-free mealtime,

- not being authorized and permitted to leave the Carter's store during rest breaks,

- not being authorized and permitted ten consecutive minutes of duty-free time during rest breaks.

2.  Survey questions regarding off-the-clock work time will show the percentage of class members who incurred unpaid wages and unpaid premium wages due to Carter's security check procedures when departing retail stores at the end of shift and during meal rest periods.  Survey

questions regarding the frequency of class members being authorized and permitted rest breaks, will show the percentage of class members that are due unpaid premium rest break wages. These percentages will assist the trier-of-fact in making a liability determination as a matter of just and reasonable inference. Estimates provided by survey participants regarding the frequency and duration of off-the-clock security check procedures can be used to project class-wide damages for unpaid wages. Estimates provided by survey participants regarding whether meal periods were provided, and rest breaks authorized and permitted, can be used to project class-wide damages for unpaid meal and rest period premium wages. The survey respondents will be asked about these issues during the time period of March 16, 2016 to the present (the proposed class period).

3. I recently conducted a survey in a class action wage and hour case involving off-the-clock security check time at Sephora retail stores. The survey of 500 class members resulted in valid and reliable estimates of security check time that were utilized to project class-wide damages. The methodology for the survey in this matter will be comparable to the methodology for the Sephora survey.

4. A survey provides an efficient manner for gathering data in this matter. I have developed a method for conducting surveys in class action wage and hour cases that blends peer-reviewed survey literature and my unique experience as a damages expert in individual wage and hour cases. I have used this survey methodology in other class action wage and hour cases to obtain valid and reliable survey responses. My unique experience is that I have conducted over 50 telephone interviews with plaintiffs and asked them to provide estimates that are the basis of their individual damages claim. Based on this experience, I have a thorough understanding of what individuals can recall and estimate and the potential bias in these estimates. The survey

2

method for this matter will result in the most precise unbiased estimates possible. The methodology for the survey is described in this declaration.

5.  The survey instrument that contains the survey questions for this matter is attached as Exhibit B.  The sample size for the survey will be approximately 500 randomly selected class members out of the population of approximately 8,000 individuals.  Davis Research will administer the survey telephonically and will gather all survey responses in approximately ten days from the time of the first phone call.  I have collaborated with Davis Research in seven other wage and hour cases including the survey in the Sephora matter.

6.  The final sample size will be selected in light of court decisions in *Bell v. Farmers Insurance*[1] and *Duran v. U.S. Bank Nat. Assn.*[2]  In *Bell*, the Court accepted a ten percent margin of error and rejected a 32 percent margin of error, and subsequently a ten percent margin of error is often referred to as the *Bell Standard*.  The target sample size in this matter will be selected in order to conform to this standard.

7.  Section IV of this report provides a detailed plan for surveying the class members regarding the aforementioned research questions.  The development of the survey questionnaire, the method of gathering the data and the analysis of the survey data is described in detail.  This methodological description will show how the survey will effectively manage the issues in question in this matter.  Section IV also shows how the survey results can be tested for potential bias.  Section V shows how the survey questions can be utilized to extrapolate class-wide damages such that defendants will not be overpaying for damages.  Section V also shows the data that will be collected to assess the potential for nonresponse bias.

---

[1] *Bell v. Farmers Insurance Exchange*. 2004. Cal.App 4th. 715, 9 Cal.Rptr.3d 544.
[2] *Duran v. U.S. Bank Nat. Assn.* (2014) 59 Cal.4th 1.

3

## II.  Professional Qualifications

7A.  My resume, fee schedule and list of trials and depositions in the last four years are attached as Exhibit A.  I received a Ph.D. in economics from the University of Utah.  My primary fields of expertise are labor economics, statistics, survey methodology and forensic economics.  My publications in the fields of labor economics, forensic economics, survey science and statistics have been cited 135 times according to Google Scholar.  I have publications in the following peer-reviewed journals: Journal of Legal Economics, Industrial Relations, Journal of Policy Analysis and Management, and the American Journal of Industrial Medicine.  In addition, I am the co-author of a peer-reviewed book published by the W.E. Upjohn Institute for Employment Research.[3]

8.  I am an adjunct associate professor of economics at St. Mary's College in Moraga, California. I teach managerial economics in the Master of Business Administration program.  I am a former member of the Board of Directors of the American Academy of Economic and Financial Experts.  My term as a board member was April 2017 to April 2020.

9.  I have substantial expertise in projecting class-wide damages based on conducting surveys and utilizing inferential statistical analysis, i.e., using the data sample of survey responses to project to a larger population.  My experience is in the form of academic qualifications and litigation consulting experience.

10.  I am the lead author of peer-reviewed journal articles regarding survey methodology and statistical analysis in class action wage and hour cases.  The title of the articles and the citations are below:

---

[3] Levine, David I., Frank W. Neuhauser, Richard Reuben, Jeffrey S. Petersen, and Christian Echeverria, *Carve-outs" in Workers' Compensation: An Analysis of the Experience in the California Construction Industry,* W.E. Upjohn Institute for Employment Research, Kalamazoo, MI 2003.

4

- "The Margin of Error on Damages Calculations Based on Sample Survey Data in Class Action Wage and Hour Cases," *Journal of Legal Economics*, Volume 25, No. 1-2, September 2019.

- "Surveys in Class Action Wage and Hour Cases and the Use of Anonymous Respondents," *Journal of Legal Economics*, Volume 22, No. 1, October 2015

The article on survey methodology describes the unique aspects of conducting surveys in wage and hour class actions and remedies for potential bias among the survey respondents.  The article on margin of error describes how to project class-wide damages from survey data and protect defendants from overpaying.

11.  I have conducted surveys in seventeen class actions and fifteen of the surveys were in wage and hour cases.  Recently, in the class action wage and hour class case *Kristal Nucci et al. v. Rite Aid Corporation*, the Honorable Judge Lucy H. Koh cited the results of a survey I conducted several times in her order for class certification.[4]  Judge Koh writes, "Dr. Petersen's expert report and underlying survey demonstrate that whether a common policy was communicated across all class members is capable of class-wide resolution.  Importantly, these common questions are not merely peripheral, but rather, go directly to liability on a class-wide basis."[5]  In the federal case titled *Coleman v Brown*, I was designated as the survey expert in a Special Master research team appointed by the Honorable Kimberly Mueller.[6]  My role was to supervise the design and implementation of a survey to psychiatrists employed by the California Department of Corrections.

12.  I was trained in survey protocol, survey design, and survey question writing during my employment with the United States Government Accountability Office (GAO) as a Senior

---

[4] *Kristal Nucci, et al. v. Rite Aid Corporation, et al*.  Case number 19-CV-01434-LHK.  Order Denying Motion to Strike and Granting Class Certification.
[5] Ibid, p.26.
[6] *Ralph Coleman, et al. v. Edmund Brown, Jr, et al.*  Case number 2:90-cv-0520 KJM KJN P.

Economist.  The GAO is the non-partisan research entity for members of Congress.  I have also conducted a survey outside of litigation during my tenure as a postdoctoral fellow at the University of California, Berkeley.  I designed the survey and oversaw the administration to the survey participants who were trauma victims treated at San Francisco General Hospital.  The results of the survey were presented at the American Association for the Surgery of Trauma annual meeting and published in the conference proceedings.[7]

13.  I have recently presented at five professional conferences of survey experts, statisticians and damages experts regarding conducting surveys in class action wage and hour cases and projecting damages from the survey responses.  I have also recently presented to attorneys on surveying in wage and hour class actions in light of the U.S. Supreme Court Decision in *Tyson Foods v. Bouaphakeo*.  The titles of the presentations and the conferences are listed below:

- "Statistical Evidence in Wage and Hour Class Actions Since Tyson Foods: Impact on Certification and Trial," Webinar hosted by Strafford Publications, June 2020

- "The Implications of Recent Legal Decisions for Survey Methodology in Class Action Wage and Hour Cases," Annual Conference of the Pacific Chapter of the American Association for Public Opinion Research, San Francisco, CA, December 2019.

- "Duran Duran: The Important Issues in the Two Duran Decisions for Surveys and Statistical Analysis," Western Economic Association Annual Conference, San Francisco, CA, June 2019.

- "The Margin of Error on Damages Calculations in Class Action Wage and Hour Cases," Allied Social Science Associations Annual Conference, National Association of Forensic Economics, Atlanta, GA, January 2019.

- "Survey Design and Analysis in Class Action Wage and Hour Cases," Annual Conference of the Pacific Chapter of the American Association for Public Opinion Research, San Francisco, CA, December 2018.

---

[7] Petersen, Jeffrey S., L. Papadakis, D. Morabito, A. Boccellari, R.C. Mackersie "Return Economic Productivity Following Acute Traumatic Injury: The Influence of Financial, Physical, and Psychosocial Factors," *Proceedings of the American Association for the Surgery of Trauma Fifty-Ninth Annual Meeting,*1999, p.223.

- "Using Surveys to Assess Damages in Class Action Wage and Hour Cases," 30th Annual Meeting of the American Academy of Economic and Financial Experts, Las Vegas, NV, April 2018.

14. I have published two peer-reviewed journal articles that utilize inferential statistical analysis from survey data.[8,9]  According to Google Scholar, one of the articles has been cited 79 times.

15. I have worked on 82 class action cases in determining the payments due the class members.[10]  The breakdown between plaintiff and defense retentions in these cases is 85 percent for plaintiffs and 15 percent for defendants.  I have testified at trial for both plaintiffs and defendants in class action cases.  In addition, I have testified at trial twice in class action wage and hour cases where I conducted a survey on behalf of plaintiffs and once on behalf of defendants where I analyzed the survey conducted by plaintiffs' expert.

16. I have worked on over 50 individual wage and hour cases where I conducted a telephone interview with plaintiffs.  I asked the plaintiffs to provide estimates of hours worked, off-the-clock work time, frequency of meal and rest periods, and/or unreimbursed job-related expenses. The estimates provided by the plaintiffs were subsequently used to project the amount of unpaid wages they may be due.  These interviews have provided me a unique perspective on how to structure a survey in a wage and hour class action.  This one-on-one interaction allowed me to assess what individuals can recall and estimate; and what potential biases may be in the estimates.  I have two important conclusions from this experience.  First, unpaid work time, interrupted meal and rest periods, and not receiving meal and rest periods are distinctive in

---

[8] Petersen, Jeffrey S. and Craig Zwerling, "Comparison of Health Outcomes Among Older Construction and Blue-Collar Employees in the United States," *American Journal of Industrial Medicine*, Volume 34, Number 3, 1998.
[9] Petersen, Jeffrey S. and Phillip Allman, "The Effect of the Intent to Retire at Age 70 or Older on Work Life Expectancy," *Journal of Legal Economics*, Volume 23, No. 2, April 2017.
[10] In addition to these matters, I have worked on over 3,000 legal cases involving income loss for individual plaintiffs.  Retentions on these matters are approximately two-thirds plaintiff and one-third defendant.

individuals' memories.  Second, informing the plaintiffs that they may be questioned by the defense about the accuracy of their answers significantly reduces the likelihood of biased responses.

### III.  Carter's Employment Policies and Declarations Regarding the Effect of the Policies

17.  The document titled "Class Action Complaint" in this matter states that defendants conduct of failing to accurately record time worked resulted in unpaid wages.[11]  This is a typical class action complaint by plaintiffs that leads attorneys to request my expertise in conducting surveys. Since there are no records available to assess some of the variables of interest in this matter, conducting a survey is an efficient and effective manner to collect data from class members to assist the trier-of-fact with determining liability and damages.  I have reviewed several declarations from potential class members who state that Carter's employment practices caused them to incur unpaid wages and unpaid premium wages.  Documentation of defendant's employment practices also show the basis for class members incurring unpaid wages and unpaid premium wages.  I utilized the declarations and the documentation of employment practices when designing the survey instrument.

*Documentation of Defendant's Employment Practices that May Have Caused Unpaid Wages and Unpaid Premium Wages*

18.  I reviewed five versions of Carter's "bag check procedures" dated July 1, 2013 to February 11, 2019.  The bag check procedures prior to September 2018 state:

---

[11] Class Action Complaint, pages 4-5.

- To protect the company and our employees, inspection of personal property and purchases will be conducted upon exiting of the store,

- Employees must open and present purses, backpacks and shopping bags so the manager can see the content,

- Pockets, flaps and zippers should be moved to allow full visibility of contents.

The survey instrument utilizes these instructions when informing the survey participants of what constitutes a security check.

19.  There is no mention of the time clock in regard to bag checks prior to September 2018.  The documents dated September 2018 and February 2019 state that employees should clock out after the bag check.  The survey instrument in this matter accounts for this potential policy change.

20.  The employment policy of clocking-out prior to security checks when departing the store forms the basis for potential unpaid wages and unpaid premium wages at the end of shifts and during meal and rest periods.

21.  I reviewed six versions of Carter's timekeeping policies dated July 6, 2015 to February 11, 2019.  Each document states that "employees should ask management for permission to leave the store during rest breaks."  Therefore, if an "authorized and permitted" rest break means leaving the work premises, the survey instrument addresses this issue by asking respondents about asking for permission and receiving permission to leave the store.

*Declarations from Potential Class Members Regarding Employment Practices Leading to Unpaid Wages and Unpaid Premium Wages*

22.  Declarations from potential class members show that they may have incurred unpaid wages and unpaid premium wages due to Carter's employment policies.

9

23. <u>Nathan Christensen</u> states:

- "Prior to the effective date of Defendant's policy change, on or about September 24, 2018, all store employees were required to clock-out prior to submitting the mandatory bag check before being allowed to leave the premises."[12]

- "employees were required to clock-out for our meal periods prior to presenting ourselves and submitting to the mandatory bag check and, in doing so, routinely waited for a manager, as required, to become available for a bag check … [I waited], on average, 1-4 minutes for a manager-level employee to become available to conduct my bag check [after clocking out]."[13]

- "I was instructed by the store manager that because rest breaks are paid time, employees are expected to remain on the premises in case they are needed to return to work."[14]

24. <u>Maria Kunst</u> states:

- "I was required to clock-out for my meal periods and then, while off-the-clock, submit to a bag check before being permitted to leave the store … In doing so, I was routinely required to forfeit 3-7 minutes [of my meal period]."[15]

- "I was required … to remain on the premises during my rest breaks."[16]

25. <u>Kristen Arena</u> states:

- I would wait, on average, 5-7 minutes for a store employee to become available to perform the mandatory bag check of my person possessions before I was released … to leave the premises.[17]

---

[12] Declaration of Nathan Christensen, page 2.
[13] Ibid., page 2.
[14] Ibid., page 3.
[15] Declaration of Maria Kunst, page 2.
[16] Ibid., page 2.
[17] Declaration of Kristen Arena, page 2.

26. Crystal Zoblisien states:

- I would wait, on average, 3-6 minutes for a store employee to become available to perform the mandatory bag check of my personal possessions before I was released … to leave the premises.[18]

27. While these declarations do not establish class-wide answers to the variables of interest in this matter, they point to a need to conduct a survey to determine if Carter's employment practices led to unpaid wages and unpaid premium wages. The declarations also show that these individuals would be able to answer the questions on the survey instrument. There is no reason why other class members wouldn't also be able to answer the survey questions. The pilot phase of the survey should confirm this statement. The pilot phase refers to testing the survey questions for clarity and comprehension as described in paragraph 62.

28. The remainder of this report shows the methodology for constructing the survey instrument and the methods for testing for bias in the survey responses.

**IV.  Sample Survey Regarding Security Check Duration and Exiting the Store During Meal and Rest Periods**

29. The survey in this matter will ask questions about:

- the frequency and duration of security check procedures,

- the frequency of employees leaving the store and going through a security check during meal and rest periods,

- whether employees were required to stay in the store during rest periods,

---

[18] Declaration of Crystal Zoblisien, pages 2-3.

• the frequency that employees were authorized and permitted ten-minute rest breaks.

 See Exhibit B for the proposed survey instrument for this matter.


***Sample Surveys in Litigation***

30.  Sample surveying is an accepted method in legal proceedings as stated in the Federal

Judicial Center's *Reference Manual on Scientific Evidence* (hereafter "*Reference Manual on*

*Scientific Evidence*"):

> *Sample surveys* are used to describe or enumerate the beliefs, attitudes, or behavior of
>
> persons or other social units.  Surveys typically are offered in legal proceedings to
>
> establish or refute claims about the characteristics of those individuals … As a method of
>
> data collection, surveys have several crucial potential advantages over less systematic
>
> approaches.  When properly *designed, executed, and described*, surveys (1) economically
>
> present the characteristics of a large group of respondents or other units and (2) permit an
>
> assessment of the extent to which the measured respondents or other units are likely to
>
> adequately represent a relevant group of individuals or other units.[19]

31.  The *Reference Manual on Scientific Evidence* states that surveys are an efficient way to

inform the trier-of-fact.  Also, the failure to conduct a survey suggests that survey responses

would have been unfavorable to the plaintiff:

> Although surveys are not the only means of demonstrating particular facts, presenting the
>
> results of a well-done survey through the testimony of an expert is an efficient way to
>
> inform the trier-of-fact about a large and representative group of potential witnesses. In
>
> some cases, courts have described surveys as the most direct form of evidence that can be

---

[19] Diamond, Sheri Seidman, "Reference Guide on Survey Research," Federal Judicial Center, Reference Manual on Scientific Evidence, Third Edition, p.361-362.

12

offered.[20] Indeed, several courts have drawn negative inferences from the absence of a survey, taking the position that failure to undertake a survey may strongly suggest that a properly done survey would not support the plaintiff's position.[21,22]

***The Duran Decision and the Sample Survey of the Class Members in this Case***

32.  The California Supreme Court's decision in *Duran v. U.S. Bank Nat. Assn.*[23] (hereafter *Duran I*) is the benchmark case addressing the use of statistical sampling as a basis for proving liability and damages in wage and hour cases. The *Duran I* decision recognized that statistical sampling may be an appropriate means of proving liability and damages in wage and hour class actions, as well as managing individual issues that could arise, provided that the statistical sampling be developed with expert input and allows the defendant an opportunity to contest the model.  The Court identified several flaws in the methodology of the *Duran I* sampling plan that should be avoided when using surveys and statistical sampling. The three key flaws are: (1) the size of the sample was too small (22 individuals), (2) the sample was not random and resulted in selection bias, and (3) the margin of error was too high due to a sample size that was too small. The margin of error that the Court identified as too high was 43.3 percent.

33.  The recent appellate level decision in the *Duran* case (filed January 17, 2018) (hereafter *Duran II*) noted two important flaws regarding survey data that was gathered by plaintiff's

---

[20] Footnote #60 from Reference Manual -- *See, e.g.*, Morrison Entm't Group v. Nintendo of Am., 56 Fed. App'x. 782, 785 (9th Cir. Cal. 2003).

[21] The cases cited that support this issue are found in footnote #61 in the Reference Manual -- Ortho Pharm. Corp. v. Cosprophar, Inc., 32 F.3d 690, 695 (2d Cir. 1994); Henri's Food Prods. Co. v. Kraft, Inc., 717 F.2d 352, 357 (7th Cir. 1983); Medici Classics Productions LLC v. Medici Group LLC, 590 F. Supp. 2d 548, 556 (S.D.N.Y. 2008); Citigroup v. City Holding Co., 2003 U.S. Dist. LEXIS 1845 (S.D.N.Y. Feb. 10, 2003); Chum Ltd. v. Lisowski, 198 F. Supp. 2d 530 (S.D.N.Y. 2002).

[22] Diamond, Sheri Seidman, "Reference Guide on Survey Research," Federal Judicial Center, Reference Manual on Scientific Evidence, Third Edition, p.372.

[23] *Duran v. U.S. Bank Nat. Assn.* (2014) 59 Cal.4th 1.

survey expert.[24]  First, there were substantial differences in responses regarding hours worked between surveys conducted in 2008 and 2015.  Second, the margin of error was calculated based on total hours worked instead of overtime hours.

34.  The sample survey in this matter will not have the flaws identified in *Duran I*.  The sample size will be a large sample (approximately 500 survey responses) that is representative of the population of class members.  The sample will be representative of the population because it will be drawn from a process in which every class member that worked twenty shifts or more for Defendants will have an equal likelihood of being selected for the survey.  The target margin of error will be five percent or less for the proportional questions and ten percent or less for the continuous non-proportional questions.  Therefore, the sample data will conform to the *Bell standard* for margin of error.  The *Bell standard* refers to the margin of error found acceptable by the Court in Bell v. Famers Insurance.[25]

35.  The sample survey in this matter will not have the flaws identified in *Duran II*.  First, the reason for the variance in the survey responses in *Duran II* was that the survey respondents were asked different questions about work hours in 2008 and 2015.  Therefore, although it appeared there was recall bias, there was no way to assess if there was bias because of the structure of the questions.  The margin of error on the Duran II survey was 41.0 percent.  As noted above, the margin of error for this survey will be ten percent or less.

---

[24] *Duran v. U.S. Bank National Association*, Court of Appeal State of California, First Appellate District, Division One, Filed January 17, 2018.
[25] *Bell v. Farmers Insurance Exchange*. 2004. Cal.App 4th, 715, 9 Cal.Rptr.3d 544.

### *The Legal Foundation for Surveys in Class Action Wage and Hour Cases*

36.  The Supreme Court of the United States ruling in *Anderson v. Mt. Clemens Pottery Co.* (United States Supreme Court 1946) shows that estimates of unpaid time can be the basis for projecting damages.  In the context of a survey, this legal decision shows that the focus of the trier-of-fact when evaluating the survey responses should be on the reasonableness of the estimates provided by the survey participants.  *Mt. Clemens* states employees may provide testimony on the amount of damages when their employer fails to keep proper records and damages may be awarded based on this testimony (pp. 687-688):

> The solution [to the lack of employer records] is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work.  Such a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying due compensation as contemplated by the Fair Labor Standards Act.  In such a situation we hold that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.  The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative [sic] the reasonableness of the inference to be drawn from the employee's evidence.  If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

15

37.  In regards to meal and rest periods, "proper records" are not required in California as to whether employees exited the work facility during a meal or rest period.  However, this legal decision provides useful guidance in that "no records" are available to assess this issue in this matter.  Therefore, the only source of information to resolve the issue is testimony (i.e. survey responses) from the class members to establish whether the meal and rest periods were granted and taken in accordance with California Code.

38.  In regards to security check duration, it is my understanding that limited security camera footage is available to potentially estimate the time of the "actual security check."  Based on the U.S. Supreme Court ruling in *Tyson Foods, Inc. v. Bouaphakeo*[26], security check camera footage can be provided in order to fill an evidentiary gap created by the employer's failure to keep adequate records and allow the trier-of-fact to determine the amount of unpaid time as a matter of just and reasonable inference.  Survey questions on the duration of security checks will supplement the camera footage and a time and motion study, to allow the trier-of-fact to determine the amount of unpaid time, including time spent waiting in line prior to the security check or securing items in lockers.

39.  The trier-of-fact in this matter is in the position of being able to determine if the survey responses can be utilized as a matter of "just and reasonable inference."  The role of the survey expert is to devise survey questions that are unbiased and valid in order to provide the Courts with the best possible data on which to make this determination.

[26] 577 U.S. 136 S. Ct. 1036; 194 L. Ed. 2d 124

*The Legal Foundation for Utilizing Averages from Survey Results to Project Class-Wide Damages*

40.  If an average of survey responses is utilized to determine damages, the average will overpay some individuals and underpay other individuals since survey respondents reported values higher and lower than the average.  There is legal precedent that this is acceptable in a class action wage and hour case and the average of survey responses can be utilized to project class-wide damages. The legal precedent is the decision about sampling and extrapolation in *Bell v. Farmers Insurance*.[27]  The *Duran I* decision stated that *Bell* is the "premier case approving the use of representative testimony in an overtime class action."[28]  The *Bell Court* stated (p.8):

> It was within trial court's discretion, in class action on behalf of approximately 2,400 claims representatives against an insurance company seeking compensation for unpaid overtime, to use statistical methodology of random sampling and extrapolation for the determination of aggregate class-wide damages; trial court was permitted to weigh disadvantage of statistical inference, the calculation of average damages imperfectly tailored to the facts of particular employees, with the opportunity it afforded to vindicate an important statutory policy without unduly burdening the courts.

41.  The sample size in *Bell* is 295.  The sample size in this matter will be approximately 500 survey responses, therefore, a much larger sample than Bell.  The next section shows the survey methodology that will generate unbiased and valid survey responses.

---

[27] *Bell v. Farmers Insurance Exchange*. 2004. Cal.App 4th‧ 715, 9 Cal.Rptr.3d 544.
[28] *Duran et al. v. U.S. National Bank Association*. 2014.  California Supreme Court, 59 Cal.4th 1172, Cal. Rptr. 3d 371, 325 P.3d 916.

17

*Sampling Plan for Survey and Statistical Analysis*

42.  Figure 1 shows the methodology for the design and process of the survey that will be conducted in this matter.  This is a well-established methodology as described in *Survey Methodology* by Robert M. Groves.[29]  Dr. Groves is a pre-eminent survey scientist and he was formerly the Director of the U.S. Bureau of the Census.  Each step of the survey design and process is described below.  This process results in a representative data set that is statistically reliable and valid.

---

[29] Groves, R. M., Fowler, F.J., Couper, M.P., Leprowski, J.M, Singer, E., Tourangeau, R., *Survey Methodology*, John Wiley & Sons, New Jersey, 2009.

18

## FIGURE 1: SURVEY DESIGN AND PROCESS[30]



---

[30] Source: Groves, Robert M. et al. 2009. *Survey Methodology*, New Jersey: John Wiley and Sons, Inc., page 47.

*Research Objectives*

43.  The research objectives of the survey are as follows:

- determine whether employees performed off-the-clock work due to Carter's security check procedures and the frequency and duration of the off-the-clock work,

- determine the frequency that employees left the store and went through a security check during their meal and rest periods,

- determine whether employees were required to stay in the store during rest breaks,

- determine the frequency that employees were authorized and permitted ten-minute rest breaks.

*Mode of Data Collection*

44.  The survey will be administered telephonically by Davis Research or a similarly qualified survey research firm.  According to peer-reviewed science on wage and hour surveys, telephone surveys tend to be the preferable method for obtaining survey responses.[31]  Davis Research has completed four surveys for me in class action wage and hour cases and three more are currently in progress.  The completed surveys involved employees at Ross Stores, Rite Aid, Sephora and Community Hospital of San Bernardino.  The current surveys involve employees of Bankers Life, Western Range and Staples.

45.  The survey in the Sephora matter[32] involved off-the-clock security check time and the telephonic method was an efficient and effective mode for obtaining the survey responses.  The telephonic method has also proven to be efficient and effective in other wage and hour surveys I have conducted.

---

[31] Petersen, Jeffrey S., Phillip Allman, and William Lee, "Surveys in Class Action Wage and Hour Cases and the Use of Anonymous Survey Respondents," *Journal of Legal Economics*, Volume 22, Number 1, October 2015.
[32] Sephora Wage and Hour Cases, San Francisco Superior, CGC-16-550894.

20

46.  In this matter, a mail survey will be problematic as class members who are no longer employed by defendants may have changed addresses.  This makes verifying whether they actually received the survey a very difficult endeavor.  An internet-based survey will likely have similar difficulties due to the problem of determining if respondents received the e-mail requesting that they participate in the survey.  A telephone survey is preferable in this matter because it allows for control over the contact with the survey participants with as many follow up calls as needed to attain an acceptable cooperation rate.

### *Sampling Frame*

47.  Sampling frames are lists or procedures intended to identify all elements of a target population.  According to *Survey Research Methods* by Floyd Fowler, "Any sample selection procedure will give some individuals a chance to be included in the sample while excluding others.  Those people who have a chance of being included among those selected constitute the sample frame."[33]  The sample frame is evaluated based on: (1) how comprehensively it covers the target population, (2) whether the probability of being selected can be computed, and (3) how efficiently the members of the sample frame can be contacted.[34]  Therefore, the sampling frame goes hand-in-hand with determining the method of data collection.

48.  The class members are the individuals who possess the knowledge to answer questions related to the duration of security checks and the frequency of exiting the store during meal and rest periods.  Therefore, they are the target population and can be comprehensively covered through a simple random sample.  Every class member who works twenty or more shifts during the class period will have an equal probability of being selected to participate in the survey.  I

---

[33] Fowler, Floyd. 2014. *Survey Research Methods*, *Fifth Edition,* Sage Publications Inc., page 15.
[34] Fowler, Floyd. 2014. *Survey Research Methods*, *Fifth Edition,* Sage Publications Inc., page 16.

have used the twenty shift criteria in other wage and hour surveys and there has been no bias due to employment tenure.  The criterion of working twenty shifts or more ensures that survey respondents have sufficient experience with the working conditions at Carter's to answer questions about employment policies.

49.  The only individuals who meet the criteria for the sample frame who have no potential to participate in the survey are those whose listed phone numbers were no longer in service and the current phone number cannot be obtained.  According to peer-reviewed research on wage and hour surveys, this is not a potential source of bias since there is no reason an individual without a working telephone number should be any different than any of the other class members.[35] Therefore, the sample frame for individuals on the class member list with working telephone numbers is valid based on the three criteria noted above.  The target population will be comprehensively covered, the probability of being selected can be calculated, and the sample members can be efficiently contacted.

*Construct and Pre-test Survey Instrument*

50.  The survey instrument is the questionnaire that is administered to the survey participants. The survey methodology textbook *Designing and Conducting Survey Research* states that the introduction of the survey instrument should build trust in the survey participants so they will be willing to be forthcoming with information:

A questionnaire is a conversation, and, like most conversations, it builds on itself, beginning with an introduction.  It is important to inform potential respondents about the

---

[35] Petersen, Jeffrey S., Phillip Allman, and William Lee, "Surveys in Class Action Wage and Hour Cases and the Use of Anonymous Survey Respondents," *Journal of Legal Economics*, Volume 22, Number 1, October 2015, page 28.

purpose of the study in order to convey its importance and alleviate any concerns that potential respondents are likely to have. From the researcher's point of view, there is a need to convince potential respondents that their participation is useful to both the survey's sponsor or client and the respondents themselves.[36]

51. The issue of trust between the survey respondent and survey interviewer has become more important over the last decade due to the increase in identity theft and the perception among the general public that identity theft should be a genuine concern. Therefore, potential survey respondents are not likely to participate in a survey unless they know why the survey is being conducted and how their responses are going to be used. This is especially the case for individuals who would fear losing their jobs as a result of participating in a survey. These individuals need to be reassured that retaliation for participating in a survey is not allowable under the law and legal action will be taken if they are retaliated against. Therefore, the "double blind" method is not advisable in a wage and hour class action survey. A double-blind survey would require that the survey respondents be unaware of the survey sponsor and the purpose of the survey. In other words, the survey respondents are "blind" about the purpose of the survey. The *Reference Manual on Scientific Evidence* advises that the double-blind method be utilized "whenever possible."[37] Therefore an analysis of whether it is possible to use the double-blind method is warranted.

52. When a survey respondent is first contacted on the phone it is imperative to gain their trust as noted above. If a survey is conducted using the double-blind method, the survey interviewer

---

[36] Rea, Louis M. and Richard A. Parker, *Designing and Conducting Survey Research: A Comprehensive Guide, Fourth Edition*, Josey-Bass, 2014, page 39.

[37] Diamond, Sheri Seidman, "Reference Guide on Survey Research," Federal Judicial Center, Reference Manual on Scientific Evidence, Third Edition, p.410-411.

cannot inform the survey respondent why they are calling.  The dialogue would be as follows if a double-blind survey were utilized in this matter:

- (Survey Interviewer) – I am calling to conduct a survey regarding your work experiences with Carter's.

- (Survey Respondent) – Why do you want this information?  How is it going to be used?  Who are you calling on behalf of?  What is this all about?

- (Survey Interviewer) – Sorry, I cannot answer any of those questions, all I can do is ask you the survey questions.

When the survey respondent does not have these important questions answered they are likely to terminate the call and not participate in the survey.   As noted above, the survey methodology textbook *Designing and Conducting Survey Research* states that during the initial phase of the survey "it is important to inform potential respondents about the purpose of the study in order to convey its importance and alleviate any concerns that potential respondents are likely to have."[38]  This is why a double-blind survey will not be used in this matter.

53.  The advisable method for conducting the survey in this matter is to make the survey interviewer and the respondents "as blind as possible."  Therefore, the scripted survey introduction will only reveal that the survey is regarding employment issues at Carter's as part of a litigation matter and the survey participants need to be accountable to defendants regarding their responses.  No other information about the litigation will be divulged unless the survey participant expresses concern about participating in the survey and potentially having to be questioned by the defense.  If this occurs, then a script will be read assuring the survey participant that no legal action could be taken against them for participating in the survey.

---

[38] Rea, Louis M. and Richard A. Parker, *Designing and Conducting Survey Research: A Comprehensive Guide, Fourth Edition*, Josey-Bass, 2014, page 39.

24

54.  The recent California Court of Appeals decision in *McCleery v. Allstate Insurance*[39] also shows why double-blind surveys should not be used in wage and hour class actions.  A double-blind anonymous survey was conducted in this matter as the basis for projecting class-wide damages.[40]  The Court's decision in this matter did not allow the survey results to be used to project class-wide damages.  The decision highlights the importance of transparency in conducting surveys in litigation so that the defense can defend itself against claims made against them.[41]   Transparency is also necessary to induce accountability among the survey respondents.  Double-blind surveys do not have transparency and do not impose accountability.  According to peer-reviewed research on class action wage and hour surveys, transparency and accountability are essential parts of survey methodology in wage and hour class actions.[42]

55.  Finally, there is an ethical consideration to disclose to the survey participants that the survey is part of litigation.  If a double-blind survey is conducted, survey participants do not know they are participating in litigation.  If the trier-of-fact subsequently requires the survey participants names to be disclosed, which occurred in *Duran*, individuals who were promised anonymity are no longer anonymous.  Their survey responses will be shown to their past or former employer.  Individuals should be informed about this possibility and a double-blind survey does not allow this information to be conveyed.

56.  The mental process of answering questions from a survey instrument is generally found in four groups of processes: comprehension, retrieval of information, estimation and judgement,

---

[39] Court of Appeal of the State of California, Second Appellate District, Division One, Filed 7/1/19.  Los Angeles Superior Court Case BC410865.

[40] Ibid., see page 2.

[41] Ibid., see page 25.

[42] Petersen, Jeffrey S., Phillip Allman, and William Lee, "Surveys in Class Action Wage and Hour Cases and the Use of Anonymous Survey Respondents," *Journal of Legal Economics*, Volume 22, Number 1, October 2015, page 32.

and reporting of an answer.[43]  Comprehension includes both the question being asked and the instructions previously given on the survey instrument.  Therefore, both the question and the instructions must be easily comprehended.  Retrieval is the process of recalling information relevant to answering the question.  Estimation and judgement are the processes of combining or supplementing the recall of information.

57.  In this matter, comprehension of the questions is not likely to be an issue.  The topics are very straightforward and familiar to the survey respondents.  The more difficult issue is the retrieval of information interacting with estimation and judgement.  All of the survey participants have the necessary information stored in their memories since they experienced the working conditions at Carter's.  However, in the process of retrieving this information, their process of estimation and judgement may be influenced by their self interest in anticipation of receiving a payout from the litigation.  Therefore, the defendants in this matter could potentially overpay due to inflated survey responses.  This situation is known as moral hazard which is defined as "any situation in which one person makes the decision about how much risk to take while someone else bears the cost if things go badly."[44]  According to peer-reviewed literature on wage and hour surveys, the solution to self-interest bias and moral hazard in a wage and hour survey is to conduct the survey without anonymity and to ensure the survey participants are aware they need to be accountable for the accuracy of their survey responses:

> Survey researchers should assess potential bias among surveyed class members in class action wage and hour cases through the lens of moral hazard.  Moral hazard has been described as 'any situation in which one person makes the decision about how much risk

---

[43] Source: Groves, Robert M. et al. 2009. *Survey Methodology*, New Jersey: John Wiley and Sons, Inc., page 220-222.
[44] Krugman, Paul R. 2009. *The Return of Depression Economics and the Crisis of 2008*. New York: W.W. Norton.

to take while someone else bears the cost if things go badly.'  Survey respondents who are anonymous bear no risk associated with inflating their work hours because there is no accountability.  Anonymous survey respondents can be very costly to the defense because inflated estimates of work hours lead to higher damages.  Survey respondents who are not anonymous bear considerable risk when inflating a work hour estimate.  They might look foolish, and possibly be subject to perjury, if they cannot substantiate their estimate of work hours during a deposition and/or trial testimony.  Informing survey respondents in a class action wage and hour case at the outset of the survey that they may be questioned by the defense about the accuracy of their answers is a useful tool in limiting moral hazard.[45]

58.  To control for the potential of self-interest bias, the following statement will be read to the survey participants during the introduction of the survey:

This survey is part of a litigation matter and therefore I need your answers to be as accurate as possible.  Your answers will not be anonymous and you may be questioned by the defendants about your answers.

59.  The survey questions will conform to the U.S. Supreme Court ruling in *Tyson Foods, Inc. v. Bouaphakeo*[46] since individual class members would present answers to these questions to establish liability and damages if they filed a lawsuit regarding their individual claim.

60.  The survey instrument (see Exhibit B) asks respondents to provide the following information regarding their employment with Carter's:

- if they are currently or formerly employed by Carter's,

---

[45] Petersen, Jeffrey S., Phillip Allman, and William Lee, "Surveys in Class Action Wage and Hour Cases and the Use of Anonymous Survey Respondents," *Journal of Legal Economics*, Volume 22, Number 1, October 2015, page 32-33.
[46] 577 U.S. 136 S. Ct. 1036; 194 L. Ed. 2d 124

- their job title,

- the number of stores where they worked,

- whether they went through security checks to exit the Carter's store,

- the frequency and duration of the security checks,

- the frequency of leaving the store and going through a security check during meal and rest periods,

- whether the employees had to ask for permission to leave the store during rest breaks,

- the frequency of having the permission to leave the store granted,

- the frequency that employees received ten consecutive minutes of duty free work time during their rest breaks.

61. The survey will also ask the respondents to provide the following information:

- Their level of certainty about the responses they provided in the survey

- Level of education

- Age

- Whether they knew anything about a lawsuit involving Carter's, and if "yes", an open-ended question about what they knew.

The responses to these questions can be utilized to test for bias in the responses as describe in the "perform analysis of data" section.

62. The survey instrument will be piloted on approximately 25 to 50 randomly selected class members. This number of pilot responses is within the prescribed range of the *Reference Manual on Scientific Evidence*.[47] The pilot is utilized to assess question clarity, question

---

[47] Diamond, Sheri Seidman, "Reference Guide on Survey Research," Federal Judicial Center, Reference Manual on Scientific Evidence, Third Edition, page 388.

comprehensiveness and question acceptability.[48]  Clarity refers to whether the respondents

understand the questions.  Comprehensiveness refers to offering survey participants the complete

range of alternatives.  Acceptability refers to burdensome questions and/or the invasion of

privacy.  The survey questions will be revised following the pilot if clarity, comprehensiveness

or burden is an issue.

*Design and Select Sample*

63.  The selection process for the potential survey participants in this matter is a simple random

sample.  This is a selection process that allows each member of the sample frame to have an

equal probability of being selected for the survey.[49]  The expected survey participants are the

potential class members compromised of hourly Carter's store workers and comparable

positions.

64.  The sample size is based on a targeted margin of error.  In this matter, the targeted margin of

error is five percent for proportional data and ten percent for non-proportional data.[50]

Proportional data refers to survey questions that ask about percentages or a "yes or no" response.

There is no guidance in statistical science quantifying what constitutes a margin of error that is

too high with respect to sample survey data in class action cases.  For example, a margin of error

that is "too high" is found in a sample mean of survey data of likely voters prior to an election.

If there are only two candidates on the ballot and the sample mean shows one candidate will

receive 52 percent of the vote and the margin of error is five percent; then the margin of error is

---

[48] Rea, Louis M. and Richard A. Parker, *Designing and Conducting Survey Research: A Comprehensive Guide, Fourth Edition*, Josey-Bass, 2014, page 38.
[49] Source: Groves, Robert M. et al. 2009. *Survey Methodology*, New Jersey: John Wiley and Sons, Inc., page 103.
[50] Rea, Louis M. and Richard A. Parker, *Designing and Conducting Survey Research: A Comprehensive Guide, Fourth Edition*, Josey-Bass, 2014, page 165.

obviously "too high." The margin of error shows that an outcome could be that this candidate may only receive 47 percent of the vote. The survey cannot make a prediction about who is likely to win the election. This type of reasoning does not apply to liability or damages in a class action wage and hour case. The margin of error is a statistic in a wage and hour case that assists the trier-of-fact by providing information about the magnitude of potential error in the results. Whether it is "too high" is a subjective assessment to be made by the trier-of-fact when balancing the welfare of plaintiffs and defendants.[51]

65. There is legal precedent that a margin of error of ten percent or less is acceptable in a class action wage and hour case if damages are to be projected from the average of the survey responses. The legal precedent is the decision about margin of error in *Bell v. Farmers Insurance*.[52] The *Duran I* decision stated that *Bell* is the "premier case approving the use of representative testimony in an overtime class action."[53] While this matter does not involve overtime, it does involve using a representative sample to project damages to the population of class members which is similar to the statistical analysis in *Bell*. The peer-reviewed statistical method for projecting damages in a class action wage and hour case when the margin of error is above ten percent is to use the lower bound of the confidence interval.[54]

66. The pilot study results will be utilized to determine the number of survey responses needed to achieve a five percent margin of error for the proportional data. The sample size is based upon the size of the class and the type of questions to be asked of the survey participants. The

---

[51] Petersen, Jeffrey S. and Phillip Allman, "The Margin of Error on Damages Calculations Based on Sample Survey Data in Class Action Wage and Hour Cases," *Journal of Legal Economics*, Volume 25, No. 1-2, September 2019.
[52] *Bell v. Farmers Insurance Exchange*. 2004. Cal.App 4th. 715, 9 Cal.Rptr.3d 544.
[53] *Duran et al. v. U.S. National Bank Association*. 2014. California Supreme Court, 59 Cal.4th 1172, Cal. Rptr. 3d 371, 325 P.3d 916.
[54] Petersen, Jeffrey S. and Phillip Allman, "The Margin of Error on Damages Calculations Based on Sample Survey Data in Class Action Wage and Hour Cases," *Journal of Legal Economics*, Volume 25, No. 1-2, September 2019.

formula for determining the sample size when proportions are the data being gathered is as follows[55]:

$$n = (Z^2 (p (1 - p)) N) / (Z^2 (p (1 - p) + (N - 1) ME^2)$$

where,

n = sample size

N = population size (i.e., the size of the class)

Z = Z score for the level of confidence

p = unknown proportion for the sample

ME = acceptable margin of error for the proportional variable

67. The proportion that requires the largest sample size is 50 percent. Therefore, to be as conservative as possible in estimating the sample size, 50 percent is inputted into the above equation for the variable "p" if there is no information available. However, the pilot depositions provide the estimated proportion for "p." The "Z score" is associated with the desired level of confidence. According to the *Reference Manual on Scientific Evidence*, a 95 percent confidence interval is widely accepted among scientists:

> Traditionally, scientists adopt the 95 percent level of confidence, which means that if 100 samples of the same size were drawn, the confidence interval expected for at least 95 of the samples would be expected to include the true population value.[56]

68. The population size for the survey is approximately 8,000 individuals that are the proposed class members. Based on the population size, the proportional value, the level of confidence and

---

[55] Rea, Louis M. and Richard A. Parker, *Designing and Conducting Survey Research: A Comprehensive Guide, Fourth Edition*, Josey-Bass, 2014, page 167.

[56] Diamond, Sheri Seidman, "Reference Guide on Survey Research," Federal Judicial Center, Reference Manual on Scientific Evidence, Third Edition, p.381.

the desired margin of error, a sample size of 360 would be sufficient to obtain a five percent margin of error or less.  If the Court permitted a higher margin of error, fewer survey responses would be required.

69.  The sample size of 360 survey responses may not be sufficient to attain the *Bell standard* of a 10 percent relative margin of error for unpaid off-the-clock security check time.  However, as noted early in this report, the *Bell standard* only applies to projecting damages from the average.  The alternative method being proposed in this report is to use the lower bound of the confidence interval to avoid an exorbitant cost associated with arriving at a ten percent relative margin of error.  Moreover, nowhere in the *Bell* decision does it state that a ten percent relative margin of error is required.  The decision only states a 32 percent margin of error was too high.  The sample size of 360 will likely result in a margin of error close to ten percent but up to 500 responses may be needed to attain a ten percent margin of error.

### *Recruit and Measure Sample*

70.  This phase of the project refers to implementation of the survey instrument to the survey participants.  To encourage participation, an incentive payment of $10 will be offered for completing the survey.  The American Association of Public Opinion Research (AAPOR) lists incentive payments on their best practices guide:

> Specific procedures designed explicitly to stimulate survey cooperation or participation should be considered, such as … offering monetary (i.e., cash) or non-monetary (some other valued reward) incentives to encourage participation.[57]

---

[57] American Association of Public Opinion Research, "Best Practices for Survey Research," https://www.aapor.org/Standards-Ethics/Best-Practices.aspx.

*Code and Edit Data*

71.  The survey data will be coded and edited by the survey research firm and sent to me in an Excel spreadsheet.

*Perform Analysis of Data*

72.   A multiple regression technique that is specifically designed for assessing bias in wage and hour class actions will be utilized to assess potential bias in the survey responses.  The regression technique is that the survey response is the dependent variable and the independent variables are the following:

- job title

- the number of stores

- employment status

- number of shifts worked

- age

- level of certainty about response

- knowledge of the lawsuit.

If the coefficients on any of these variables are statistically significant it is a potential indicator of bias.  The coefficient can subsequently be used to adjust the survey response such that the bias will be removed.

73.  Multiple regression analysis is a widely accepted method for determining the effect of different variables on the variable in question as explained in the *Reference Manual on Scientific Evidence*:

Multiple regression analysis is a statistical tool used to understand the relationship between or among two or more variables. Multiple regression involves a variable to be explained—called the dependent variable—and additional explanatory variables that are thought to produce or be associated with changes in the dependent variable. For example, a multiple regression analysis might estimate the effect of the number of years of work on salary. Salary would be the dependent variable to be explained; the years of experience would be the explanatory variable.[58]

74. The regression results will show if the different job titles and store locations resulted in differential outcomes regarding the issues in this matter. If the coefficients on the job titles and store variables are not statistically significant, it is compelling evidence that different job duties and store locations did not lead to different outcomes regarding the security check durations and frequency of departing the store during meal and rest periods. If the job titles and store locations are statistically significant, the magnitude of the difference is shown in the coefficient. This can be the basis for weighting the data to arrive at a valid projection of class-wide damages.

### V.  How the Survey Data can be Used to Extrapolate to the Class (Average and Lower Bound)

75. The survey is conducted on a sample of the class members. The data is then used to extrapolate to the remainder of the class. If the data is valid and reliable, and the margin of error is within acceptable limits, then the extrapolation will result in a measure of class-wide damages that is scientifically valid. Also, the frequency questions provide "a piece to the puzzle" in determining liability.

---

[58] Rubenfeld, Daniel L., "Reference Guide on Multiple Regression," Federal Judicial Center, Reference Manual on Scientific Evidence, Third Edition, p.305.

34

76.  If the margin of error is ten percent or less for unpaid time, then the *Bell standard* holds that damages can be determined from the sample average.  If the margin of error is greater than ten percent but less than 30 percent, then the lower bound of the 95 percent confidence interval can be utilized to project class-wide damages.[59]   The reason for using the lower bound is clearly spelled out in the peer-reviewed journal article on this topic:

> …. which of the following options constitutes justice in a class action. Option 1: deny payments to class members and grant a windfall to defendants because the variance in data points caused a margin of error greater than ten percent. Option 2: use the lower bound of the 95 percent confidence interval to award damages in those cases only in which the margin of error exceeds ten percent. The latter option ensures (to a 97.5 percent procedural reliability) defendant is not overpaying and subsequently redistributes income among the class members. Undoubtedly, all class members would prefer some payments for damages as opposed to no payments. Therefore, the welfare of the class members is addressed under Option 2 in a way ignored under Option 1. Defendants' welfare is also addressed by Option 2 since there is little chance across cases of general overpayment for damages. Option 1, on the other hand, rewards defendants with a windfall for wrongdoing and harms the welfare of the class members.[60]

Therefore, the lower bound accomplishes the balancing of plaintiffs and defendant's welfare.

77.  The average number of minutes of unpaid security check time, or the lower bound of the 95 percent confidence interval, is mapped onto the class members payroll records to project their

---

[59] Petersen, Jeffrey S. and Phillip Allman, "The Margin of Error on Damages Calculations Based on Sample Survey Data in Class Action Wage and Hour Cases," *Journal of Legal Economics*, Volume 25, No. 1-2, September 2019, p.149.

[60] Petersen, Jeffrey S. and Phillip Allman, "The Margin of Error on Damages Calculations Based on Sample Survey Data in Class Action Wage and Hour Cases," *Journal of Legal Economics*, Volume 25, No. 1-2, September 2019, p.149.

total unpaid wages.  Unpaid premium wages are determined by mapping the responses to the meal and rest period security check questions onto the payroll data.  The responses to the meal and rest period questions result in a probability that a meal period was not provided and a rest break was not authorized and permitted.

78.  The survey results will be provided to the damages expert in this matter to calculate class-wide damages.

*Assessing Bias in the Survey Average and Lower Bound due to Nonresponse*

79.  It has been my experience in reviewing defense expert reports in class action wage and hour cases where I have conducted a survey is that they claim the responses are biased due to nonresponse.  This means that the individuals who took the survey are not representative of the individuals who did not take the survey.  However, I have never seen a compelling analysis from these defense experts that nonresponse bias is present in the results.  Their arguments usually boil down to the speculative assumption that individuals who have something to gain from the survey are more likely to be willing to participate in the survey.  I have never seen any data to suggest this is actually occurring.  Moreover, the counterfactual may be more compelling – individuals who want to present favorable information about defendants may be more willing to participate in the survey.

80.  I will instruct Davis Research to track the number of calls placed to the survey respondents.  The hypothesis is that individuals who may be biased will be "eager" to participate in the survey and will take the survey within one to two call attempts.  The responses of these potentially "eager" respondents can be compared to the responses of the respondents who respond after more call attempts.  In every survey I have conducted to date, the hypothesis has been rejected

36

since there was no statistically significant difference in the survey responses between individuals that took the survey with few call attempts compared to those who took the survey after many call attempts.

81.  I also instruct Davis Research to track the individuals who refuse to participate in the survey. Davis Research will track the point of refusal in the survey instrument and ask for a detailed reason why the individual is refusing to participate in the survey.  This method of tracking allows for a statistical analysis of differences in the point of refusal as well as an analysis of the reasons for refusing.

82.  The other common criticism among defense experts is that the response rate is too low.  The response rate is the number of survey participants divided by the number of individuals attempted to contact to take the survey.  However, I have never seen a compelling analysis that the response rate is an indicator of nonresponse bias.  The now superseded second edition of the *Reference Manual on Scientific Evidence* (published in 2000) stated that certain response rates needed to be achieved to obtain an unbiased data set.  However, during the last two decades, a substantial amount of research has been conducted on response rates and none has found that a specific rate is an indicator of bias.  The third edition of the *Reference Manual on Scientific Evidence* (published in 2011) contained none of the language about specific response rates that was in the second edition.  The third edition states that "reasonable estimates" can be obtained even if there is a relatively low response rate:

> Contrary to earlier assumptions, surprisingly comparable results have been obtained in many surveys with varying response rates, suggesting that surveys may achieve reasonable estimates even with relatively low response rates. The key is whether

nonresponse is associated with systematic differences in response that cannot be adequately modeled or assessed.[61]

83.  Moreover, one of the pre-eminent scholars on survey research is Robert Groves[62], and his research clearly shows that response rates do not tell a clear picture of potential bias.  Public Opinion Quarterly, the peer-reviewed journal of the American Association for Public Opinion Research, devoted an entire issue to the subject of non-response bias.  Dr. Groves wrote the lead article titled "Nonresponse Rates and Nonresponse Bias in Household Surveys." In this article, Dr. Groves addresses the issue of whether there is a singular level for a response rate that shows response bias is present.  He concludes definitively that there is not:

> Many surveys of the U.S. household population are experiencing high refusal rates. Nonresponse, can, but need not, induce nonresponse bias in survey estimates.  Recent empirical findings illustrate cases when the linkage between nonresponse rates and nonresponse biases is absent.[63]

Groves further states,

> Assembly of methodological studies whose designs permit estimation of nonresponse bias shows that empirically there is no simple relationship between nonresponse rates and nonresponse biases. That is, research results comport with the assertion that covariances between survey variables and response propensities are highly variable across items within a survey, survey conditions, and populations. Hence, there is little empirical

---

[61] Diamond, Sheri Seidman, "Reference Guide on Survey Research," Federal Judicial Center, Reference Manual on Scientific Evidence, Third Edition, p.385.

[62] Dr. Groves was the head of the United States Bureau of the Census from 2009 to 2012 and is currently a professor in the math and statistics department at Georgetown University.

[63] Groves, Robert M., "Nonresponse Rates and Nonresponse Bias in Household Surveys," *Public Opinion Quarterly*, Volume 70, No. 5, Special Issue 2006, page 646.

38

support for the notion that low response rate surveys de facto produce estimates with high nonresponse bias.[64]

84.  Based upon my considerable experience in conducting surveys in wage and hour class actions and interviewing more than 50 individuals with wage and hour claims, the most likely reason that people don't participate in wage and hour surveys is fear of litigation.  They do not want to be called to deposition or trial because it is an unknown process of which they are fearful.  This provides no indication as to how they may respond to survey questions if they participated.

## VI.  Conclusion

85.  In summary, a survey can be performed in this matter to assess whether class members may be due unpaid wages for off-the clock security checks and unpaid premium wages for meal and rest period violations.  The survey will conform to generally accepted scientific principles established by the relevant scientific community of survey experts and statisticians.  The results of the survey will be estimates of security check time, estimates of the frequency of departing during meal and rest periods, and estimates of authorized and permitted rest breaks.  These estimates can be utilized to project class-wide damages.

86. The validity and reliability of the survey data is determined by the survey method, the survey questionnaire and the analysis of the survey data.  Based on my review of the issues in this case and my considerable experience in designing surveys and analyzing survey data in class action wage and hour cases, it is my conclusion that a survey can be conducted in this matter that will yield valid and reliable data.  The time period for the survey is approximately ten days from the time the first phone call is placed.

---

[64] Ibid., page 670.

87.  The sample size selection will conform to the court decisions in *Bell* and *Duran*.  If a ten percent margin of error is attained on unpaid work time, then the sample average can be utilized to project class-wide damages.  If the margin of error is higher than ten percent, in the range of 15 to 20 percent, then the lower bound of the 95 percent confidence interval can be utilized to project damages.  The lower bound ensures with 97.5 probability that defendants will not be overpaying for damages.  This peer-reviewed method for projecting damages balances the welfare of plaintiffs and defendants in class action wage and hour cases.

88.  The margin of error on the frequency variables will be five percent or less.  This will provide the trier-of-fact with useful information for determining liability.  The survey responses represent a "piece of the puzzle" for determining liability.

89.  I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed on March 10, 2021 at Oakland, California.

_____

Jeffrey S. Petersen, Ph.D.

# EXHIBIT A

# JEFFREY S. PETERSEN

Allman & Petersen Economics, LLC
7677 Oakport Street, Suite 610
Oakland, CA 94621

Phone: (510) 382-1550
FAX: (510) 382-1472
E-mail: jeff@allmaneconomics.com

## EMPLOYMENT HISTORY

2003 – present  ***Partner***
Allman & Petersen Economics, LLC
Oakland, California

2014 – present  ***Adjunct Associate Professor of Economics***
& 1999 – 2001  St. Mary's College
Moraga, CA

1998 – 2003  ***Senior Economist***
U.S. Government Accountability Office (formerly the General Accounting Office)
San Francisco, California

1999 – 2001  ***Economics Instructor***
Golden Gate University
San Francisco, California

1995 – 1998  ***Postdoctoral Fellow***
University of California, Berkeley

1990 – 1995  ***Research and Teaching Assistant***
University of Utah
Salt Lake City, Utah

## EDUCATION

1996  Postdoctoral Training Program in Health Economics
University of California, Berkeley

1995  Ph.D. in Economics, University of Utah

1989  B.A. in Economics, San Jose State University

## PUBLICATIONS

***Peer-Reviewed Book***

*"Carve-outs" in Workers' Compensation: An Analysis of the Experience in the California
Construction Industry,* W.E. Upjohn Institute for Employment Research, Kalamazoo, MI
2003 (co-authored with David Levine, Frank Neuhauser, Richard Reuben, and Christian
Etcheverria).

*Peer-Reviewed Journal Articles*

"The Margin of Error on Damages Calculations Based on Sample Survey Data in Class Action Wage and Hour Cases," *Journal of Legal Economics*, Volume 25, No. 1-2, September 2019 (co-authored with Phillip Allman).

"The Effect of the Intent to Retire at Age 70 or Older on Work Life Expectancy," *Journal of Legal Economics*, Volume 23, No. 2, April 2017 (co-authored with Phillip Allman).

"Surveys in Class Action Wage and Hour Cases and the Use of Anonymous Respondents," *Journal of Legal Economics*, Volume 22, No. 1, October 2015 (co-authored with Phillip Allman and William Lee).

"Carve-Outs from the Workers Compensation System," *Journal of Policy Analysis and Management*, 2002, Volume 21, No. 3, (co-authored with David Levine and Frank Neuhauser).

"Health Care and Pension Benefits for Construction Workers: The Role of Prevailing Wage Laws," *Industrial Relations*, 2000, Volume 39, No. 2.

"A Comparison of Health Outcomes Among Older Construction and Blue-Collar Employees in the United States," *American Journal of Industrial Medicine*, 1998, Volume 34, No. 3, (co-authored with Craig Zwerling).

*Other Publications*

"The Margin of Error on Damages Calculations Based on Sample Survey Data in Class Action Wage and Hour Cases," proceedings of the 2019 Allied Social Sciences Association, National Association of Forensic Economics Section (co-authored with Phillip Allman).

"International Responses to an Aging Labor Force," *Work Options for Mature Americans*. Teresa Ghilarducci and John Turner eds., Notre Dame, Indiana: University of Notre Dame Press, 2005. (co-authored with Charles Jeszeck, Anthony Defrank, Katherine Leavitt, Janice Peterson, Yunsian Tai, and Howard Wial).

"Benefits vs. Wages: How Prevailing Wage Laws Affect the Mix and Magnitude of Compensation to Construction Workers," in *The Economics of Prevailing Wage Laws,* Peter Philips and Hamid Azari eds., Ashgate Publishing, 2005. (co-authored with Erin Godtland).

"Private and Public Sector Employment Policies to Extend the Labor Force Participation of Older Workers," *Proceedings of the 55th Annual Industrial Relations Research Association Annual Conference, 2003.*

"Return to Economic Productivity Following Acute Traumatic Injury: The Influence of Financial, Physical, and Psychosocial Factors," *Proceedings of the American Association for the Surgery of Trauma Fifty-Ninth Annual Meeting,*1999, (co-authored with Lara Papadakis, Diane Morabito, Herb Ochitill, Alicia Bocellari, and Robert Mackersie).

*Portable Pensions for Casual Labor Markets: Lessons from the Operating Engineers Central Pension Fund*, Quorum Books, Westport, CT, 1996 (co-authored with Teresa Ghilarducci, Garth Mangum, and Peter Philips).

***Selected General Accounting Office Reports***

"Older Workers: Policies of Other Nations to Increase Labor Force Participation,"
GAO-03-307, Feb. 2003

"Older Workers: Demographic Changes Pose Challenges for Employers and Workers,"
GAO-01-85, Nov. 2001

"Characteristics of Persons in Labor Force Without Pension Coverage,"
GAO/HEHS-00-131, Aug. 2000

"Social Security Reform: Implications of Raising the Retirement Age,"
GAO/HEHS-99-112, Aug. 1999

## REVIEWER FOR PEER-REVIEWED JOURNALS AND BOOKS

Industrial Relations (University of California, Berkeley)

Perspectives (peer-reviewed section of the Social Security Bulletin)

Journal of Legal Economics

Palgrave Macmillan, Economics & Business Publications

The Earnings Analyst

## PRESENTATIONS

"Statistical Evidence in Wage and Hour Class Actions Since Tyson Foods: Impact on Certification and Trial," Webinar hosted by Strafford Publications, June 2020

"The Implications of Recent Legal Decisions for Survey Methodology in Class Action Wage and Hour Cases," Annual Conference of the Pacific Chapter of the American Association for Public Opinion Research, San Francisco, CA, December 2019.

"Duran Duran: The Important Issues in the Two Duran Decisions for Surveys and Statistical Analysis," Western Economic Association Annual Conference, San Francisco, CA, June 2019.

"The Margin of Error on Damages Calculations in Class Action Wage and Hour Cases," Allied Social Science Associations Annual Conference, National Association of Forensic Economics, Atlanta, GA, January 2019.

"Survey Design and Analysis in Class Action Wage and Hour Cases," Annual Conference of the Pacific Chapter of the American Association for Public Opinion Research, San Francisco, CA, December 2018.

*Jeffrey S. Petersen, page 3 of 5*

"Surveys in Class Action Wage and Hour Cases," CLE Seminar, San Francisco, CA, October 2018.

"Using Surveys to Assess Damages in Class Action Wage and Hour Cases," 30th Annual Meeting of the American Academy of Economic and Financial Experts, Las Vegas, NV, April 2018.

"Working to Age 70 or Older – How Much Does Intention Matter?  Evidence from the Health and Retirement Study," 28th Annual Meeting of the American Academy of Economic and Financial Experts, Las Vegas, NV, March 2016.

"Policies to Extend the Labor Force Participation of Older Workers" – Industrial Relations Research Association Section of the Allied Social Sciences Association Annual Meeting, Washington, DC, Jan. 2003.

Discussant for the panel "The Population Age 50-70 -- Past Trends and Future Projections" at the National Academy of Social Insurance conference on the Implications of an Aging Workforce for Income Security and Employee Benefits, Washington, D.C., Nov. 2001

"Raising the Eligibility Ages for Social Security Benefits: Work and Health Issues Associated with this Policy Change" - School of Public Policy, University of California, Los Angeles, Jan. 2001

"The Labor Market for Older Workers" - Bay Area Labor Economists Fall Workshop, Public Policy Institute of California, San Francisco, CA, Nov. 2000

"Raising the Eligibility Ages for Social Security Benefits: An Analysis of the Policy Implications" - Association for Public Policy Analysis and Management Annual Research Conference, New York, NY, Oct. 1998.

"Carving Out Construction Employees from the Workers Compensation System in California: Putting Theory into Practice"
- Industrial Relations Research Association Section of the Allied Social Sciences Association Annual Meeting, Chicago, IL, Jan. 1998
- National Occupational Injury Research Symposium, National Institute of Occupational Safety and Health, Morgantown, WV, Oct. 1997

"Return to Work Following Acute Traumatic Injury"
- American Association for the Surgery of Trauma Annual Meeting, Boston, MA Sept. 1999
- National Occupational Injury Research Symposium, National Institute of Occupational Safety and Health, Morgantown, WV, Oct. 1997

"Health Care and Pension Benefits for Construction Workers: The Role of Prevailing Wage Laws"
- Health Economics Research Organization Section of the Allied Social Sciences Association Annual Meetings, New Orleans, LA, Jan. 1997

"Retirement from the Construction Industry" – University of California, Berkeley, Department of Demography, May 1995.

*Jeffrey S. Petersen, page 4 of 5*

**HONORS**

| | |
|---|---|
| Member of the Board of Directors, American Academy of Economic and Financial Experts | 2017-2020 |
| National Research Service Award, Public Health Postdoctoral Fellowship, U.S. Department of Health and Human Services | 1995-1997 |
| Outstanding Scholar Athlete Honor Roll, San Jose State University | 1988-1989 |
| NCAA Division I Tennis Team, San Jose State University | 1987-1989 |

**PROFESSIONAL ORGANIZATIONS**

American Economic Association

National Association of Forensic Economics

American Academy of Economic and Financial Experts

American Association for Public Opinion Research

Western Economic Association International

*Jeffrey S. Petersen, page 5 of 5*

# ALLMAN & PETERSEN ECONOMICS, LLC

Phillip H. Allman, Ph.D.
Jeffrey S. Petersen, Ph.D.
Max Allman, MA, CFA

7677 Oakport Street, Suite 610 • Oakland, CA 94621
TEL (510) 382-1550  FAX (510) 382-1472

## FEE SCHEDULE (1/25/19)

(1)  Economic research and analysis, report preparation, document review, office and client consultations, deposition preparation and trial preparation.[1]

| | |
|---|---|
| -- Ph.D. Economist | $550 / hour |
| -- Senior Economist | $375 / hour |
| -- Economist or CPA | $250 / hour |
| -- Survey Administration | $125 / hour |

(2)  Deposition testimony[2]                                          $650 / hour

(3)  Arbitration and trial testimony[3]                          $650 / hour

(4)  Travel time                                                             $250 / hour

---

[1] Bills will be submitted periodically and are due upon presentation, not at the conclusion of the case.

[2] Payment for deposition testimony shall be paid in accordance with C.C.P. '2034 (i) (3) --i.e. payment of an expert's fees for the anticipated length of a deposition shall be paid at the commencement of his/her deposition, and any outstanding balance shall be paid within five days of receiving an itemized statement of the expert's services.

[3] All invoices to date must be paid prior to trial testimony.  In addition, an additional retainer must be paid prior to the trial testimony based upon the estimated invoice for the testimony.

**Trial & Deposition List for Jeffrey S. Petersen (Last Four Years)**

| | Case | Case Number | Jurisdiction | Date |
|---|---|---|---|---|
| **Trials & Arbitrations** | Fernandez et al. v. Villas Papillon | RG13683606 | Alameda | February, 2017 |
| | Shields et al. v. Security Paving Company | BC4922828 | Los Angeles | September, 2017 |
| | Robinson Jr. et al. v. Open Top Sightseeing | 4:14-CV-00852-PJH | Northern District of California | October, 2017 |
| | Yumul et al. v. Indus Investments et al. | BC565881 | Los Angeles | April, 2018 |
| | Zarate v. Sungrow USA Corporation | 01-18-0003-8025 | American Arbitration Association | September, 2019 |
| **Depositions** | Fernandez et al. v. Villas Papillon | RG13683606 | Alameda | February, 2016 |
| | Bowerman et al. v. Field Asset Services | CV 13-00057 WHO | Northern District of California | March, 2017 |
| | Bowerman et al. v. Field Asset Services | CV 13-00057 WHO | Northern District of California | June, 2017 |
| | Robinson Jr. et al. v. Open Top Sightseeing | 4:14-CV-00852-PJH | Northern District of California | July, 2017 |
| | Ruiz et al. v. Jack in the Box | RG16807477 | Alameda | August, 2017 |
| | Shields et al. v. Security Paving Company | BC4922828 | Los Angeles | September, 2017 |
| | Pineda et al. v. Lithographix | BC612372 | Los Angeles | January, 2018 |
| | Zarate v. Sungrow USA Corporation | 01-18-0003-8025 | American Arbitration Association | June, 2019 |
| | Dueker et al. v. CRST Expedited | 2:18-cv-08751-FMO-FFM | Central District of California | September, 2019 |
| | Nevarez et al. v. Costco Wholesale Corp. | 2:19-cv-03454-SVW-SKx | Northern District of California | January, 2020 |
| | Sephora Wage and Hour Cases | CGC-16-550894 | San Francisco | June, 2020 |
| | Dhawan v. Regents of the Univ. of CA | RG18911598 | Alameda | October, 2020 |
| | Van Bebber v. Dignity Health | 1:19-cv-00264-DAD-EPG | Eastern District of California | October, 2020 |
| | Ayala v. UPS Supply Chain Solutions | 5:20-cv-00117-PSG-AFM | Central District of California | February, 2021 |

# EXHIBIT B

<u>**CARTER'S SURVEY INSTRUMENT**</u>

Respondent Name: _____

Hello, may I please speak with [RESPONDENT NAME]? I am not selling anything.

> <u>**IF THE PERSON WHO ANSWERS THE PHONE SAYS: "Who's Calling":**</u>
>
> This is _____, I am with Davis Research calling to speak with [RESPONDENT FIRST NAME] about his/her work at Carter's and we are offering $10 for completing a survey.
>
> <u>**IF THE PERSON WHO ANSWERS THE PHONE SAYS: "Why are you calling? / Can you tell me what you are calling about?":**</u>
>
> We have been asked to conduct a survey by the lawyers who represent employees who performed work at Carter's.
>
> <u>**IF THERE IS NO ANSWER, LEAVE THE FOLLOWING VOICE MAIL:**</u>
>
> Hello, I am _____ calling from Davis Research and I am not trying to sell you anything. I am calling to conduct a survey about employment issues at Carter's at the request of lawyers who represent the employees.  Please return my phone call at _____ so I can administer the survey to you.  This survey should take approximately 10 minutes of your time.  As a token of our appreciation we will send you a $10 gift card for completing the survey.

<u>**ONCE RESPONDENT IS ON THE PHONE:**</u>

Hello, I am _____ calling from Davis Research.  I am calling to conduct a survey about employment issues at Carter's at the request of attorneys who represent the employees.  This survey should take approximately 10 minutes of your time.  As a token of our appreciation we will send you a $10 gift card for completing the survey.

> [DISPO HERE – 99 TO CONTINUE]

This survey is part of a litigation matter and therefore I need your answers to be as accurate as possible.  Your answers will not be anonymous and you may be questioned by the defendants about your answers.  Therefore, take your time when responding to the questions.  Even if you're not completely sure of the exact answer to a question, please give me your best estimate.  We simply need survey answers that are as accurate and honest as possible.

**READ ONLY IF NEEDED:** You will be represented free of charge by the lawyers for the employees should there be questions about your survey answers.  This is not likely since there will be hundreds of individuals completing the survey.  It is illegal for Carter's to take action against you for participating in this survey.

**READ ONLY IF NEEDED IF RESPONDENT REQUESTS ANONYMITY:**  Your anonymity cannot be guaranteed.  It is illegal for Carter's to take action against you for participating in this survey.

**NOTE TO PROGRAMMER:** If respondent refuses to participate in the survey, please read the following:

> 01 Continue to Survey
> 99 Refused
>
> [IF 99 HERE OR REFUSED IN INTRODUCTION]

It is very important to understand why you are not willing to take the survey.  Can you please tell me your reason?

**CODE RESPONSE VERBATIM**

1A.  Are you currently employed by Carter's?

> 1.  Yes
> 2.  No
>
> 99.  (DO NOT READ) Refused [END INTERVIEW]

1B-1.   [if Q1A = 1]  What is your job title at Carter's? [capture verbatim]
[if Q1A = 2]  What was your job title when you stopped working at Carter's? [capture verbatim]

1D.  Did you ever work at a Carter's store in California?

> 1.  Yes
> 2.  No
> 98.  (DO NOT READ) Don't Know
> 99.  (DO NOT READ) Refused
>
> **SKIP LOGIC:**
> - If Q1D = 1, then read "If you also worked at a Carter's store outside of California, the remaining questions in this survey only pertain to your employment periods at Carter's stores in California."
> - If Q1D = 2, 98 or 99; skip to Q5

2

1E.  How many Carter's stores in California have you worked at?

  [CODE NUMBER]

  98.  (DO NOT READ) Don't Know
  99.  (DO NOT READ) Refused

  **NOTE TO INTERVIEWER:**
  - If Q1E >= 2, then read "During this survey you will be asked about your experiences working for Carter's, please keep in mind that you worked at different stores and answer the questions based on your average experience in these stores."

[Q2 Intro]  Your responses to following survey questions should only be in regard to your work experiences after March 2016.  If you worked for Carter's before March 2016, please disregard that time period when answering the questions [pause].

In the following questions, I am going to use the term "security inspection" to refer to the inspection of your bag, your purse or your pockets when you left a Carter's store at the end of your work shifts or for a meal or rest break.  A security inspection includes holding up any personal items you may possess.  A security inspection also includes waiting for the manager to clear you to depart the store even if you are not searched.

2.  At the end of your work shifts with Carter's, did you always go through security inspections, sometimes go through security inspections, or never go through security inspections?

  1.  Always
  2.  Sometimes
  3.  Never.

  98.  (DO NOT READ) Don't Know
  99.  (DO NOT READ) Refused

  **SKIP LOGIC:**
  - If Q2 = 1 or 3; skip to Q2A
  - If Q2 = 98 or 99; skip to Q3

2-1.  At the end of your work shifts, what percentage of the shifts did you go did you go through a security inspection?

  [CODE RESPONSE AS A PERCENTAGE]

  98.  (DO NOT READ) Don't Know
  99.  (DO NOT READ) Refused

2A.  When you left the Carter's store for a meal break, did you always go through security inspections, sometimes go through security inspections, or never go through security inspections?

    1.  Always
    2.  Sometimes
    3.  Never.
    4.  I never left the store for meal breaks.

    98.  (DO NOT READ) Don't Know
    99.  (DO NOT READ) Refused

**SKIP LOGIC:**
- If Q2 = 3 and Q2A = 3 or 4; skip to Q3
- If Q2A = 1 or 3; skip to Q2A-2
- If Q2A = 4; skip to Q2D
- If Q2A = 98 or 99; skip to Q3

2A-1.  When you left the Carter's store for a meal break, what percentage of the time did you go through a security inspection?  Please respond with a percentage.

[CODE RESPONSE AS A PERCENTAGE]

[ALLOW FOR RANGE]

    98.  (DO NOT READ) Don't Know
    99.  (DO NOT READ) Refused

2A-2.  When you left the Carter's store for a rest break, did you always go through security inspections, sometimes go through security inspections, or never go through security inspections?

    1.  Always
    2.  Sometimes
    3.  Never.
    4.  I never left the store for rest breaks.

    98.  (DO NOT READ) Don't Know
    99.  (DO NOT READ) Refused

**SKIP LOGIC:**
- If Q2A-2 = 1 or 3; skip to Q2B
- If Q2A-2 = 4; skip to Q2D
- If Q2A-2 = 98 or 99; skip to Q3

4

2A-3.  When you left the Carter's store for a rest break, what percentage of the time did you go through a security inspection?  Please respond with a percentage.

>     [CODE RESPONSE AS A PERCENTAGE]

>     [ALLOW FOR RANGE]

>     998.  (DO NOT READ) Don't Know
>     999.  (DO NOT READ) Refused

2B.  What percentage of your rest breaks did you leave the Carter's store?

>     [CODE RESPONSE AS A PERCENTAGE]

>     [ALLOW FOR RANGE]

>     998.  (DO NOT READ) Don't Know
>     999.  (DO NOT READ) Refused

2C.  What percentage of your meal breaks did you leave the Carter's store?

>     [CODE RESPONSE AS A PERCENTAGE]

>     [ALLOW FOR RANGE]

>     998.  (DO NOT READ) Don't Know
>     999.  (DO NOT READ) Refused

**NOTE TO PROGRAMMER FOR Q2D:** If Q2 = 3; skip to Q2F.

2D.  You may have worked for Carter's when security checks were conducted off-the-clock and on-the-clock.  This policy change may have occurred at your store around September 2018.  These questions only pertain to the time period when security checks were conducted off-the-clock.  I would like you to think about how long it took to complete a security inspection, on average [interviewer pause briefly], after you clocked out from the time clock that tracked your work hours.  Your estimate of security inspection time should include the time you spent waiting for the inspection to begin and waiting to be released by the manager and the inspection.  Your estimate should not include any long wait times that rarely happened.  If you were always clocked in during security inspections, please give that as your response.

After you clocked out at the end of your shifts, what was the typical length of time, on average, for a security inspection?

>     [ALLOW ANSWERS IN SECONDS OR MINUTES]

5

[ALLOW FOR RANGE]

[**NOTE TO INTERVIEWER AND PROGRAMMER:** If respondent states they were sometimes clocked in during security checks, remind them to give only clocked out time and then ask this follow up question: "what percentage of your shifts were you clocked in during security inspections?" Code the percentage as 2D-1]

97.  Always clocked in during end of shift security inspections
98.  (DO NOT READ) Don't Know
99.  (DO NOT READ) Refused

**NOTE TO PROGRAMMER FOR Q2F:** If Q2A = 3 or 4; skip to Q2G]

2F.  After you clocked out for a meal break, what was the typical length of time for a security inspection when you left the store, on average?

[ALLOW ANSWERS IN SECONDS OR MINUTES]

[NOTE TO INTERVIEWER AND PROGRAMMER: If respondent states they were sometimes clocked in during security checks, remind them to give only clocked out time and then ask this follow up question: "what percentage of your shifts were you clocked in during security inspections?" Code the percentage as 2FA]

97.  Always clocked in during meal break shift security inspections
98.  (DO NOT READ) Don't Know
99.  (DO NOT READ) Refused

**NOTE TO PROGRAMMER FOR Q2F:** If Q2A-2 = 3 or 4; skip to Q2G

2F-1.  My next question is about rest periods.  Please recall that you don't clock out for rest periods so I am interested in knowing security check time without regard to clocking out.  What was the typical length of time for a security inspection when you left the store for a rest break, on average?

[ALLOW ANSWERS IN SECONDS OR MINUTES]

98.  (DO NOT READ) Don't Know
99.  (DO NOT READ) Refused

6

3.      Did you need permission from your manager or supervisor to leave the Carter's store during your rest breaks?

1.  Yes
2.  No

98.  (DO NOT READ) Don't Know
99.  (DO NOT READ) Refused

**SKIP LOGIC:**
- If Q3 = 2, 98 OR 99, SKIP TO Q3B

3A.     When you requested permission from your manager or supervisor to leave the store during a rest break, how often were you allowed to leave?

1.  Always
2.  Sometimes
3.  Never

98.  (DO NOT READ) Don't know
99.  (DO NOT READ) Refused

**SKIP LOGIC:**
- If Q3A = 1, 3, 98 OR 99, SKIP TO Q4

3A-1.   What percentage of your requests to leave the store were granted?

[CODE RESPONSE AS A PERCENTAGE]

[ALLOW FOR RANGE]

998.  (DO NOT READ) Don't know
999.  (DO NOT READ) Refused

My next questions are about what occurred during your rest breaks.  When answering these questions please keep in mind that you likely had fifteen minutes for your rest breaks.

4.      When you stayed inside the Carter's store during rest breaks, did you always have at least ten consecutive minutes when you were not asked by management to perform any of your job duties?

1.  Yes
2.  No

98.  (DO NOT READ) Don't Know
99.  (DO NOT READ) Refused

**SKIP LOGIC:**
- If Q4 = 1, 98 OR 99, SKIP TO Q5

4A.     How frequently did you have at least ten consecutive minutes when you were not asked by management to perform any of your job duties?  Please estimate as percentage of the rest breaks when you stayed in the store.

[CODE RESPONSE AS A PERCENTAGE]

[ALLOW FOR RANGE]

998.  (DO NOT READ) Don't know
999.  (DO NOT READ) Refused

8

We are almost finished, I just have a few concluding questions that will be used for statistical purposes.

5.  Please think about all the work experiences you have described for me during this survey. How sure are you that the answers you gave me accurately describe your work experiences at Carter's?  Would you say …

    1.  Not sure at all
    2.  Slightly sure
    3.  Moderately sure
    4.  Very sure
    5.  Completely sure

    98.  (DO NOT READ) Don't know
    99.  (DO NOT READ) Refused

6.  What is the highest level of education you have completed? [DO NOT READ CHOICES]

    1. Less than High School.
    2. GED
    3. High School Diploma
    4. Vocational Degree
    5. Some College
    6. College Degree
    7. Graduate Degree

**NOTE TO INTERVIEWER:** Multiple responses acceptable with Vocational Degree response.

    98. (DO NOT READ) Don't Know
    99. (DO NOT READ) Refused

7.  What is your age?

8.  What is your gender?

    1.  Male
    2.  Female
    3.  (DO NOT READ) Transgender (identify as female)
    4.  (DO NOT READ) Transgender (identify as male)

    99.  (DO NOT READ) Refused

9.  Prior to my call today, did you know anything about a lawsuit involving Carter's?

    1.  Yes

9

2.  No

98.  (DO NOT READ) Don't Know
99.  (DO NOT READ) Refused

**SKIP LOGIC:**
- If Q9 = 2, 98 OR 99, SKIP TO CONCLUDING STATEMENT

10.  Please tell me, in as much detail as you can, everything you can remember about the purpose of any lawsuit involving Carter's.  I am going to type your answer as you speak it, so it would help me if you speak slowly while I type.  Please don't tell me how you learned what you know or who told you – just tell me what you know about the purpose of any lawsuit involving Carter's.

TYPE OPEN-ENDED ANSWER

**[PROBE REPEADETLY "WHAT ELSE DO YOU REMEMBER ABOUT THE PURPOSE OF ANY LAWSUIT CARTER'S?" UNTIL THE RESPONDENT SAYS "NOTHING"]**

**CONCLUDING STATEMENT:** That's all the questions I have for you. Thank you very much for your help. Would you like me to send you $10 via Amazon gift card or Starbuck's coffee?

Amazon
Starbucks
DO NOT READ, Prefers check

EMAIL
It will arrive in about 7 days. What email address would you like it sent to?
CAPTURE AND CONFIRM EMAIL.

Mailing (IF CHECK SELECTED AT CONCLUDING STATEMENT)

What is your mailing address:

Street
City, State Zip